**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:10-cv-32-RJC-DSC**

| | | |
|---|---|---|
| **MOHAMMED HOSSEIN SAEEDI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DAVID L. ROARK,** | ) | **ORDER** |
| **Director, U.S. Citizenship and** | ) | |
| **Immigration Services, Texas Service** | ) | |
| **Center,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** comes before the Court on the Plaintiff's Complaint appealing an agency action (Doc. No. 1), the Defendant's Motion for Summary Judgment (Doc. No. 15), and the related filings. For the reasons set forth below, the Court will deny the Defendant's motion and remand this matter to U.S. Citizenship and Immigration Services for a new determination.

**I.      BACKGROUND**

The plaintiff in this action, Mohammed Hossein Saeedi, is an Iranian national who has been granted political asylum by the United States. He sought an adjustment of status to permanent resident in July 2002. It took seven years for the United States Citizenship and Immigration Services (USCIS) to deny Saeedi's application. In denying the application, USCIS determined that Saeedi was inadmissible when he originally entered the United States in 1999, because he misrepresented a material fact, namely that he intended only to visit rather than remain in the United States, when he obtained a B-2 tourist visa.

The facts are largely undisputed. Saeedi was born on July 24, 1966, and raised in Iran. He immigrated to the United States in 1989 as an unmarried child of a permanent resident, and returned to Iran that same year.

Some time after returning to Iran, Saeedi became a member of a political organization. He later experienced the organization to be both corrupt and militant, so he distanced himself from that group. Saeedi received an invitation from his sister to visit her in the United States. Under perceived threats and feelings that he may be in grave danger because of alienating militant clerics, he traveled to Turkey and applied for a visitor's visa. He was denied in the first instance, but he was granted a visitor's visa upon his second application. During this period, Saeedi also sought to have his former status as a legal permanent resident reinstated, but this request was denied because he was now married.[1]

Saeedi subsequently left Iran for the United States. He entered the United States on July 2, 1999, with a B-2 tourist visa, which held an expiration date of January 1, 2000. Roughly four months later, on November 4, 1999, Saeedi filed an application for asylum, citing fears of reprisal by the extremist political faction from which he had distanced himself, and fears of severe persecution by the Iranian government. An immigration judge in Atlanta granted Saeedi asylum on February 22, 2001.

Saeedi's wife and two young daughters were reunited with him in the United States in January 2002, receiving asylee status as his relatives. After waiting the required one-year period from the date he received asylum, Saeedi submitted an I-485 application for adjustment of status to permanent resident. The United States Immigration and Naturalization Service ("INS"), USCIS's

---

[1] He had formerly qualified for permanent residency as an unmarried child of a lawful permanent resident.

predecessor, received the I-485 application on April 3, 2002, and the application was assigned to INS's Nebraska Service Center.

Saeedi received a notice from the Nebraska Service Center dated April 14, 2002, stating that "[i]t usually takes 300 to 330 days from the date of this receipt for us to process this type of case." (Doc. No. 14-3 at 5). More than three years later, in August 2005, the Nebraska Service Center transferred Saeedi's I-485 application to the Texas Service Center ("TSC") in Mesquite, Texas, purportedly to "speed processing" of the case. (Doc. No. 14-3 at 6: I-797C, Notice of Action).

Subsequently, the TSC requested more evidence from Saeedi. In a "Request for Initial Evidence" dated September 20, 2005, the TSC stated that the "office is unable to complete the processing of your application without further information. You must submit the information within twelve (12) weeks. Failure to do so may result in the denial of your application." The TSC requested three items: (1) a completed medical examination form (Form I-693); (2) a Supplemental Form to I-693 containing an analysis of Saeedi's vaccination history signed by a civil surgeon; and (3) and updated and completed Biographic Information Sheet, Form G-325-A.

Saeedi visited a civil surgeon and received the required vaccinations on October 11, 2005. He then provided all the information requested by the TSC on October 17, 2005, well-within the twelve-week time period. And there his application sat for roughly three and one half years.

Saeedi then received a letter from the TSC and signed by Roark, dated June 13, 2009, entitled "Request for Evidence." The letter begins, "This office is unable to complete the processing of your application without further information." (Doc. No. 14-4 at 9). It goes on to point out various discrepancies and inconsistencies between his I-485 application and statements in his asylum application. The letter requests that Saeedi submit a new completed Form I-485 without fee. On its second page, the letter states the following:

3

You have been found inadmissible, or ineligible for adjustment of status under Section 212(a)(6)(C)(i). . . [for] '**willfully misrepresenting a material fact**' [in procuring a visa] . . . . You must complete the attached Form I-602, Application By Refugee For Waiver of Grounds of Excludability.

. . . In the I-602, please specify that the inadmissibility you seek to waive is due to the use of a false document at the time of your entry. Describe and explain the specifics of your fraudulent act, including obtaining a visa from the American Consulate.

(Id. at 10) (emphasis in original). Finally, the letter informs Saeedi that his Report of Medical Examination and Vaccination Record (Form I-693), which he had submitted in October 2005, "does not indicate that the required tuberculin skin test was conducted." (Id.). The letter closes, "You must submit the requested information within thirty (30) days from the date of this letter. Failure to do so may result in the denial of your application." (Id.).

Thereafter, on July 16, 2009, Saeedi provided the requested tuberculin skin test, along with an extensive letter explaining the perceived discrepancies and why they were not incorrect. In the letter, Saeedi responds to the request for the I-602 waiver of inadmissibility by stating that he has been granted asylum, and that he has left the United States to travel and returned without any problem three times since. He did not submit the Form I-602, which would have required him to admit to fraud. Finally, the letter responds to USCIS's other requests from the most recent "Request For Evidence."

In the interim, Saeedi's wife and two daughters all had their I-485 applications granted and received lawful permanent resident status. But about two months after sending his July 16 letter, Saeedi discovered through USCIS's automated online system that his application had been denied; he had not received a letter officially denying his application. Saeedi wrote to USCIS on September 8, 2009, requesting a formal letter of denial so that he could appeal it by providing the necessary explanations and evidence. (Doc. No. 14 at 4: Form I-290B, Notice of Appeal or Motion).

4

By letter dated December 17, 2009, USCIS sent notice to Saeedi that his case had been reopened and then subsequently denied that same day. The notice states, "Collectively the information established you misrepresented a material fact which allowed your entry to the United States and the opportunity of applying for Asylum on November 30, 1999. USCIS attempted to resolve this issue by allowing you the opportunity of requesting a waiver for this violation." (Doc. No. 1-3 at 9). This letter informed Saeedi that he would not lose his asylum status unless USCIS or the Executive Office for Immigration Review were to formally terminate it, and that he remained authorized to work in the United States incident to his asylum status. Finally, the letter makes clear that no appeal lies from the decision, and that it does not preclude the filing of a new Form I-485 with required supporting evidence and the proper fee.

Saeedi filed the instant lawsuit on January 27, 2010, naming David L. Roark, Director of the Texas Service Center, as the defendant in his official capacity.

## II.    STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides for judicial review of final agency actions. See 5 U.S.C. §§ 702, 704. Under the APA,

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (E) unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute.

Id. § 706(2)(A), (E). In this context, "a reviewing court must decide if the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Virginia Agr. Growers Ass'n, Inc. v. Donovan, 774 F.2d 89, 93 (4th Cir. 1985). As a result, this Court does not have discretion to substitute its own judgment for the

5

agency's.  Rather, the error must be more serious.  For example, an agency finding would normally

be considered arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Further, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance."  United Seniors Ass'n v. Social Sec. Admin., 423 F.3d 397,

404 (4th Cir. 2005) (citations omitted); cf. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972)

(explaining that a court should uphold the agency's decision even if the court disagrees with the it,

as long as the decision is supported by substantial evidence).

III.     DISCUSSION

A.     Legal framework

An asylee seeking an adjustment to permanent resident status must (1) "appl[y] for such

adjustment; (2) have "been physically present in the United States for at least one year after being

granted asylum"; (3) "continue[] to be a refugee . . . or a spouse or child of such a refugee"; (4) not

be "firmly resettled in any foreign country"; and (5) be "admissible . . . as an immigrant . . . at the

time of examination for adjustment."  8 U.S.C. § 1159(b).

Title 8, United States Code, Section 1182(a) provides in relevant portion: "Any alien who,

by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or

has procured) a visa, other documentation, or admission into the United States or other benefit

provided under this chapter is inadmissible."  8 U.S.C. § 1182(a)(6)(C)(i).  "Findings of willful

misrepresentation are reviewed under the substantial evidence standard . . . . " Singh v. Gonzales,
413 F.3d 156, 161 (1st Cir. 2005).[2]

Where an asylee seeking an adjustment of status is determined to be statutorily inadmissible
as an immigrant under § 1182(a)(6)(C)(i) for willfully misrepresenting a material fact, the asylee
must file a Form I-602 application for waiver of grounds of excludability.  Only if USCIS grants the
waiver, in its discretion, will it then grant an adjustment of status pursuant to an  I-485 application.
See (Doc. No. 15-1 at 6: *U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Servs.*,
Interoffice Memorandum dated October 31, 2005).  In such a situation, "an adjudicator must require
the refugee-based adjustment applicant to file a Form I-602 with an explanation, and supporting
documentation if available, demonstrating that the alien is eligible for and should be granted a
waiver . . . as a matter of discretion."  (Id.) ("The grant of asylee . . . status does not automatically
waive any ground of inadmissibility.").

**B.      Whether USCIS's determination was based on substantial evidence**

This entire case turns upon one question: Whether USCIS's determination that Saeedi is
statutorily inadmissible was based on substantial evidence.  If the decision was based on substantial
evidence, then Saeedi's failure to file a Form I-602 application for waiver of grounds of
excludability after USCIS requested it left the Defendant no choice but to deny his I-485 application.
If the decision that Saeedi is statutorily inadmissible was not based upon substantial evidence, then
the matter must be remanded for a new determination.

---

[2] The parties cite as applicable both the Administrative Procedure Act's "arbitrary and capricious" standard
as well as the "substantial evidence" standard.  The Court here applies the substantial evidence standard, recognizing
that these two standards are largely synonymous, and that an agency's factual determination that is not based upon
substantial evidence is necessarily "arbitrary and capricious" in this context.  See Butte County, Cal. v. Hogen, 613
F.3d 190, 194 (D.C. Cir. 2010) ("Although we are dealing with the question whether agency action is arbitrary or
capricious, in their application to the requirement of factual support the substantial evidence test and the arbitrary or
capricious test are one and the same." (citations omitted)).

Saeedi claims USCIS manufactured a reason for his inadmissibility out of mere speculation and that its finding is unsupported by the evidence. The Defendant argues that the facts in the record indicate Saeedi intended to immigrate to and permanently remain in the United States when he obtained a non-immigrant tourist visa, which was a willful misrepresentation of a material fact. The Defendant thus contends that under the required deferential standard of review, its determination should be upheld.

Saeedi contends he intended only to visit when entered the United States in 1999.[3] The question is not, however, whether Saeedi in fact intended to enter as a non-immigrant when he received the tourist visa and entered the United States in 1999. The operative question is whether there was substantial evidence upon which USCIS could conclude the opposite.

USCIS relied on two main facts in concluding Saeedi intended to remain in the United Stated when he obtained the tourist visa. First, the Defendant points to Saeedi's application for asylum, where he referred to his "flight to freedom" and a man who helped him leave Iran "to the United States of America and freedom." (Doc. Nos. 14-3 at 16; 14-4 at 2). Second, the Defendant highlights that Saeedi had applied for reinstatement of his former status as a lawful permanent resident of the United States, and was denied, shortly before obtaining the tourist visa that enabled his entry into the United States in 1999. The Defendant argues that these two facts are substantial evidence supporting USCIS's determination that Saeedi intended to remain in the United States when he obtained the tourist visa. Thus, the Defendant argues, Saeedi committed fraud or willfully misrepresented a material fact when seeking to obtain the visa, which rendered him inadmissible at

---

[3] Saeedi attached an affidavit to his response to the motion for summary judgment asserting he intended to return to Iran when he entered the United States in 1999 on the tourist visa. However, the Court may only review the record that was before USCIS when it made its determination, and this affidavit cannot be considered as evidence. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

the time he entered the country in 1999 and ineligible for an adjustment to permanent resident status thereafter.

Saeedi provides little in the way of relevant argument or citations to record evidence. However, contrary to the Defendant's assertions, while the facts indicate Saeedi was intent on leaving Iran, there is nothing evidencing an intent to remain permanently in the United States at the time he obtained the visa. Rather, Saeedi's asylum application states that he received an invitation from his sister to "visit" her in the United States, not to live with her. Saeedi's wife and two young children remained in Iran. Saeedi still had a home in Iran where his family lived. His asylum application further portrays a father and husband yearning to return to his family:

> If I was not sure about the dark future, I would not have been able to be far from my family since July 1999. I have a lovely wife and two children whom are so young and sweet. They are 8 and 3 years old. It is really hard to be far from them. If I had small chance, for sure, I should have gone back to home. But there has been no way for me.

(Doc. No. 14-4 at 5).

There is no good evidence of where Saeedi, at the time he secured the tourist visa, intended to go if he could not return to Iran upon the expiration of the visa. Statements in his asylum application regarding his "flight to freedom" are retrospective, and colored by the fact that the asylum application itself seeks a status that would allow Saeedi to remain in the United States indefinitely. The phrase "flight to freedom" does not inherently suggest more than visitation; and there is no record evidence beyond this alliterative reference. Relying on the mention of a "flight to freedom" in the asylum application to support a finding of fraud or willful representation when he obtained the visa two years earlier strikes the Court as arbitrary.

Further, the mere fact that Saeedi sought to have his status as a lawful permanent resident reinstated[4] and was denied because he was married sheds no light on whether he intended only to visit the United States when he obtained the tourist visa relatively soon thereafter. There may be a suspicion that he intended to immigrate rather than visit; but suspicion does not amount to substantial evidence.

Case law on the issue at hand is sparse, which is evidenced by the parties' inability to cite a single case on point. The cases finding petitioners inadmissible under § 1182(a)(6)(C)(i) for willfully representing a material fact generally involve clear misrepresentation or fraud. See Ymeri v. Ashcroft, 387 F.3d 12, 20 (1st Cir. 2004) (holding use of false passports to pass through the country on transit without visa status violates § 1182(a)(6)(C)(i)); Joseph v. Gonzales, 2006 WL 2971668, at   Kurt v. U.S. Atty. Gen., 2007 WL 3089400, at *2 (11th Cir. Oct. 24, 2007) (unpublished) (holding petitioner, who admitted he misrepresented his true intent when entering the country on transit without visa status, violated § 1182(a)(6)(C)(i)).

Here, there is no clear misrepresentation or fraud. Instead, there is a hazy uncertainty as to Saeedi's intent amidst a conspicuous lack of evidence. This lack of evidence leads to any host of possibilities. For instance, Saeedi had navigated through the United Arab Emirates and Turkey in seeking to obtain a visa to enter the United States in response to his sister's invitation to visit. These countries' closer proximity to Saeedi's wife and two daughters, who lived in Iran at the time, may make it more likely, absent any evidence otherwise, that he intended to immigrate to one of these other countries upon leaving the United States when the tourist visa expired. And while the Court does not suggest that Saeedi actually intended to immigrate to Turkey or the UAE, such speculation

---

[4] Saeedi had been a lawful permanent resident years before because of his mother's legal status in the United States, and he had spent a very brief period in the United States with her before returning to Iran.

is exactly the sort of guesswork in which the Defendant engaged.  While substantial evidence "may be somewhat less than a preponderance," United Seniors Ass'n, 423 F.3d at 404, the Defendant's guesswork falls far short of that standard.

Saeedi may even have entered the United States with the *hope* of remaining here, should he be received as a political asylee.  However, such a hope, conditioned on the understanding that he may end up having to leave should his asylum application be denied, does not amount to a willful misrepresentation of a material fact.  What is more, the record does not indicate whether Saeedi even hoped to remain in the United States when he initially entered the country, much less whether he intended to remain.  A reasoning mind would not accept this lack of evidence as sufficient to support the conclusion that Saeedi willfully misrepresented a material fact when securing a B-2 tourist visa.[5] United Seniors Ass'n, 423 F.3d at 404.

The Defendant assumed, based on speculation, that Saeedi intended to permanently remain in the United States when he entered the country on a tourist visa.  As a result, in processing his application for adjustment of status, the Defendant required that he first admit something for which there is little evidence other than a hunch – that he committed fraud – and second, to request a waiver for this assumed wrongdoing.  When Saeedi refused to admit as much, his application was denied.  Because the determination of Saeedi's intent was not based upon substantial evidence, the Court will remand this matter to USCIS for a legally appropriate decision.[6]  Further, as Saeedi has

---

[5]  While not binding on USCIS's determination, it is telling that there was never an allegation of fraud throughout Saeedi's proceedings before the Immigration Judge, who saw fit to grant Saeedi asylum.

[6]  Saeedi also seeks mandamus relief.  The court "may issue a writ of mandamus if the petitioner has no other adequate means to obtain relief to which there is a 'clear and indisputable' right."  In re Blackwater Security Consulting, LLC, 460 F.3d 576, 592 (4th Cir. 2006) (quoting Media Gen. Operations, Inc. v. Buchanan, 417 F.3d 424, 433 (4th Cir. 2005).  Because he has an adequate means to obtain the relief he seeks, the Court does not address his request for mandamus relief.

already waited far too long for a final resolution of his application, prompt action by USCIS is imperative.  As a result, the reopening and adjudicating of the Saeedi's petition shall be completed within forty-five days of the date of this Order.  See, e.g. Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 937 (9th Cir. 2008) (upholding district court's imposition of deadline for remand proceedings);  Nat'l Org. of Veterans' Advocates v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1381 (Fed. Cir. 2001) (setting a 120-day deadline for rule-making on remand).

## IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.      The Defendant's Motion for Summary Judgment (Doc. No. 15) is **DENIED**;

2.      The determination of USCIS is **REVERSED** and **REMANDED**, and the Defendant shall reopen and adjudicate the Plaintiff's application for adjustment of status under the appropriate legal standard;

3.      Such reopening and adjudicating of the Plaintiff's application shall be completed within **forty-five (45) days** of the date of this Order.

**SO ORDERED.**

Signed: March 15, 2011

Robert J. Conrad, Jr.
Chief United States District Judge